[No. D010641. Fourth Dist., Div. One. Feb. 27, 1991.]

JOHN E. SANDOVAL III, Plaintiff and Appellant, v. MERCURY INSURANCE GROUP et al., Defendants and Respondents.

**COUNSEL**

Jerry Michael Suppa for Plaintiff and Appellant.

Ely, Fritz, Hogan & DiPinto and Michael G. Hogan for Defendants and Respondents.

**OPINION**

**BENKE, J.—**

### INTRODUCTION

In this case an insured told one of his employees not to drive a truck. The insurer contends the employee therefore did not have permission within the meaning of Insurance Code section 11580.1, subdivision (b)(4).

We agree with the insurer.

### STATEMENT OF FACTS

A. *Underlying Action*

Plaintiff and appellant John E. Sandoval III is the owner of a landscape maintenance business. On the morning of September 14, 1984, two of Sandoval's employees, Del Camp and Vince Campbell,[1] were working at one of Sandoval's job sites. Earlier in the day Vince had driven a 1959 Ford truck owned by Sandoval to another one of Sandoval's job sites. At lunchtime Del picked up the keys to the truck and started driving himself and Vince to lunch. On the way to lunch the truck collided with a motorcycle driven by Duhamel R. Rodriguez.

On October 21, 1984, Rodriguez filed a complaint against Del and Sandoval, San Diego County Superior Court No. BE531136. In deposition

---

[1] Given the similarity in their last names, for the sake of clarity we will refer to Camp and Campbell by their first names.

testimony he provided in Rodriguez's personal injury action, Sandoval stated in unequivocal fashion that before the accident he told Del never to drive any of Sandoval's vehicles. Sandoval testified that he was outraged when he learned Del had been driving at the time of the collision with Rodriguez.

On July 12, 1988, Rodriguez's claim was heard by an arbitrator. Although Sandoval had denied Del had permission to drive the truck, the arbitration found against Sandoval and awarded Rodriguez $28,000 in damages.[2]

B. *These Proceedings*

Shortly after it occurred, Sandoval notified his insurer, defendant Mercury Insurance Group doing business as Mercury Casualty Company (Mercury), about the accident. On May 22, 1985, Mercury denied coverage and declined to provide Sandoval a defense on the grounds the 1959 Ford truck was not listed on Sandoval's policy. On October 21, 1986, Sandoval filed a complaint against Mercury in which he alleged Mercury's agent was negligent in failing to list the 1959 Ford on Sandoval's policy. Mercury answered Sandoval's complaint on January 30, 1987.

On February 3, 1989, following settlement of Rodriguez's underlying claim, Mercury moved for summary judgment or, in the alternative, for summary adjudication of issues. Mercury argued the truck was not listed on Sandoval's policy and that its agent, Kochok & Company, Inc. (Kochok), never had any knowledge about Sandoval's ownership of the truck.

In the alternative Mercury argued Del did not have permission to use the truck and accordingly under the terms of the policy and Insurance Code section 11580.1, subdivision (b)(4), Sandoval had no coverage for Del's collision with Rodriguez.

In his initial opposition to the motion for summary judgment, Sandoval addressed himself solely to Mercury's contention its agent had no knowledge of the 1959 Ford and hence was not responsible for the fact the truck was not listed on Sandoval's policy. In particular Sandoval relied on the deposition testimony of his prior agent, John Lydick, who stated that in conjunction with Sandoval's application to Mercury he had supplied Jodie Elliott, an employee of Kochok, with a copy of Sandoval's previous policy and "accord form." Those documents list the 1959 Ford truck.

---

[2] Our review of the superior court file in No. BE531136 discloses that on January 23, 1989, Rodriguez agreed to accept $18,000 in settlement of his claim against Sandoval.

In its reply to Sandoval's opposition, Mercury focused its attention on its argument Del was not a permissive user. Mercury pointed out that in its separate statement of undisputed facts it had listed as undisputed the fact that "At the time of the subject accident, [Del] did not have permission to drive plaintiff Sandoval's 1959 truck." Mercury further pointed out that in response to Mercury's separate statement, Sandoval agreed this fact was undisputed.

Argument on Mercury's motion was initially heard on March 20, 1989. At the hearing the trial court continued the matter to allow the parties to pursue additional discovery on the issue of permissive use. The hearing was continued on two more occasions for the same reason.

On May 12, 1989, Vince's deposition was taken. Vince stated that on the morning of the accident he had driven the 1959 Ford truck with Del as a passenger from Sandoval's yard to an initial job site and later to a second job site where he could drop off a trailer. After Del had unhooked the trailer, Del took the keys from the back of the truck and told Vince he would drive to lunch. According to Vince, he told Del "fine" and they drove off together. Although Vince was aware another employee, "Ed," was not allowed to drive Sandoval's vehicles, he had never been told Del was not allowed to use Sandoval's vehicles. In fact Vince testified Del had driven Sandoval's trucks in the past. Vince testified that on the day of the accident, Del was acting as "lead man" and did not need Vince's permission to drive the truck.

Following submission of excerpts of Vince's deposition and additional briefing, the trial court granted Mercury's motion for summary judgment. Thereafter the trial court entered a judgment dismissing Sandoval's complaint.

Sandoval filed a timely notice of appeal.

## ISSUES ON APPEAL

The principal issue we confront on appeal is whether Del was, as a matter of law, a permissive user within the meaning of Insurance Code section 11580.1, subdivision (b)(4).[3]

---

[3] Sandoval has not disputed either here or in the trial court Mercury's contention that if Del was not a permissive user, Mercury is entitled to a judgment in its favor. Thus, like the parties and the trial court we treat the permissive use issue as dispositive of Sandoval's claims.

DISCUSSION

I

*Summary Judgment*

■ "The purpose of a summary judgment motion is to determine if there are any triable issues of material fact, or whether the moving party is entitled to judgment as a matter of law. [Citations.] The summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. [Citation.] The affidavits of the moving party are strictly construed, while those of the party opposing the motion are liberally construed. [Citations.] If the affidavits of the party opposing the motion contain factual averments within the general area of the issues framed by the pleadings, they are sufficient to make out a prima facie case. [Citation.] Any doubts as to the propriety of granting the motion must be resolved in favor of the party opposing the motion. [Citations.]" (*Cascade Gardens Homeowners Assn.* v. *McKellar & Associates* (1987) 194 Cal.App.3d 1252, 1255-1256 [240 Cal.Rptr. 113].) Mindful of these procedural principles, we turn to the substantive issues presented by the parties.

II

*Coverage of the 1959 Ford Truck*

Although Mercury argued in the trial court its agent had no knowledge of Sandoval's ownership of the 1959 Ford truck, on appeal Mercury has not pursued this issue. In light of the deposition testimony of Lydick, Sandoval's agent, we can appreciate Mercury's position. Lydick's statement he provided the Mercury agent with documents which disclosed Sandoval's ownership of the truck prevent Mercury from establishing its agent's lack of knowledge as a matter of law.

III

*Del's Permissive Use*

Vehicle Code section 17150 provides in pertinent part: "Every owner of a motor vehicle is liable and responsible for death or injury to person or property resulting from a negligent or wrongful act or omission in the operation of the motor vehicle, in the business of the owner or otherwise, by

any person using or operating the same with the permission, express or implied, of the owner."

Insurance Code section 11580.1, subdivision (b)(4), provides an important corollary to this provision. In pertinent part it requires that all automobile liability policies issued in California provide coverage "to the same extent that insurance is afforded to the named insured, to any other person using, or legally responsible for the use of, such motor vehicle, provided such use is by the named insured or with his or her permission, express or implied, and within the scope of such permission."

The court in *Jurd* v. *Pacific Indemnity Co.* (1962) 57 Cal.2d 699, 704 [21 Cal.Rptr. 793, 371 P.2d 569], explained the relationship between the imputed liability provided by Vehicle Code section 17150 and the insurance coverage required by the Legislature: "Because the imputed liability statute 'must be construed in a manner not favoring imposition of liability on the otherwise nonnegligent owner' and 'uncertainties' in the language as to the intended coverage of an automobile insurance policy 'must be construed in favor of imposing liability on the insurer' [citation], the 'issue of permission to be decided' in the successive actions 'was different' commensurate with the 'opposing modes of construction' [citation]. In this vein it was accordingly said that 'the scope of "permission" under such a policy may in certain situations be broader than the scope of "permission" under former section 402, because a different rule of construction is applicable to the owner's liability statute than the construction of an automobile liability policy, and "permission" within the two contexts need not be construed in a similar manner' [citation]."

In addition to the rule which requires a broad interpretation of the provisions of insurance policies, we also note the important public policy in favor of providing monetary protection for tort victims. In interpreting Insurance Code section 11580.1, the Supreme Court has stated: "We have uniformly held that 'the *entire* automobile financial responsibility law must be liberally construed to foster its main objective of giving "monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer grave injury through the negligent use of those highways by others." ' " (*Metz* v. *Universal Underwriters Ins. Co.* (1973) 10 Cal.3d 45, 53 [109 Cal.Rptr. 698, 513 P.2d 922]; accord *Ohio Farmers Ins. Co.* v. *Quin* (1988) 198 Cal.App.3d 1338, 1347 [244 Cal.Rptr. 359].)

In light of these principles it is not surprising cases which have interpreted the permissive use statutes have generally held that where a vehicle owner entrusts his car to one person and that person in turn permits a third

party to drive, the third party is driving with the "permission" of the owner both for purposes of imposing vicarious liability and finding insurance coverage. (*Peterson* v. *Grieger, Inc.* (1961) 57 Cal.2d 43, 54 [17 Cal.Rptr. 828, 367 P.2d 420]; *Souza* v. *Corti* (1943) 22 Cal.2d 454, 460-461 [139 P.2d 645, 147 A.L.R. 861]; *Financial Indem. Co.* v. *Hertz Corp.* (1964) 226 Cal.App.2d 689, 697-699 [38 Cal.Rptr. 249]; *Haggard* v. *Frick* (1935) 6 Cal.App.2d 392, 394 [44 P.2d 447]; *State Farm Mut. Auto. Ins. Co.* v. *Porter* (9th Cir. 1951) 186 F.2d 834, 839.)

The cases have found permission of the owner may be implied from the circumstances under which the initial permittee obtained use of the car. For instance, in *Peterson* v. *Grieger, Inc.*, the owner of the car, Grieger, gave the keys to Cole, a parking lot attendant; Cole in turn allowed an unlicensed acquaintance, Leovich, to drive the car to an overflow parking lot. On the way to the overflow lot, the car hit a bicycle rider. In upholding a verdict finding Grieger vicariously liable, the court stated: "[T]he jury could have reasonably inferred either that Grieger gave Cole implied permission to have his automobile driven to a nearby parking lot if necessary, or that such operation did not amount to a substantial violation of the physical limits of Grieger's implied permission." (57 Cal.2d at pp. 52-53.)

In *Souza* v. *Corti*, a father allowed a son to drive the father's car for an evening out with a friend; the father instructed the son not to lend the car to anyone else. During the course of the evening, the son asked the friend to drive the car and the friend was involved in an accident. In distinguishing earlier cases and finding implied permission, the court stated: "But in each of those cases the permittee was not given the general use of the vehicle. He had the car or truck to make certain repairs or tests, but turned it over to another for the purpose under circumstances which indicated that such delegation was not contemplated by the owner. . . . [¶]In the present case the use which was being made of the borrowed car at the time of the accident was the use which was contemplated by the owner. Any secret restrictions imposed by him on the manner of its use do not negative the controlling fact that it was being used with the owner's permission at the time of the accident." (22 Cal.2d at pp. 460-461.)

In *Financial Indem. Co.* v. *Hertz Corp.*, the court upheld a judgment against a car rental company and its insurer for damages sustained when a customer of the company allowed a third party to drive one of the company's cars. Although the rental contract signed by the customer prohibited the third party's use, neither the customer nor the third party was aware of the restriction. The court stated: "In the instant case, the trial court found that 'Hertz did not have a reasonable basis for believing that the said restriction contained in the referred to Hertz contract would be carried out;

and since Hertz had no such reasonable expectations, Hertz is deemed to have given implied permission to the use of the subject automobile without the said restriction. . . .' Further, neither Munson nor Vargo was aware of such restriction. Under such circumstances, Hertz must be held to have anticipated such use by others than the renter with his permission, and hence, impliedly consented thereto." (226 Cal.App.2d at p. 699.)

Questions have arisen when in allowing a third person to drive the car, the initial permittee violates the owner's instructions. (Compare *Financial Indem. Co.* v. *Hertz Corp.*, *supra*, 226 Cal.App.2d at pp. 697-699; *Allstate Ins. Co.* v. *Travelers Ins. Co.* (1975) 49 App.Div.2d 613 [370 N.Y.S.2d 675] (implied permission); and *Norris* v. *Pacific Indemnity Co.* (1952) 39 Cal.2d 420, 424-426 [247 P.2d 1]; *Travelers* v. *Budget Rent-A-Car Systems, Inc.* (9th Cir. 1990) 901 F.2d 765, 767-769 (no implied permission).) With respect to insurance coverage, these questions seem to have been resolved in some measure in California by the 1970 addition of the limiting phrase "within the scope of such permission" to Insurance Code section 11580.1, subdivision (b)(4). (See Stats. 1970, ch. 300, §§ 3, 4, pp. 573-754; see also *Jordan* v. *Consolidated Mut. Ins. Co.* (1976) 59 Cal.App.3d 26, 40-41 [130 Cal.Rptr. 446].)

■ Relying on the cases which have found liability or coverage for a third party's use, Sandoval argues we may find Del had Sandoval's permission to drive the truck. Sandoval contends the fact Vince had Sandoval's express permission and Vince in turn gave his permission to Del is enough to establish permissive use within the meaning of Insurance Code section 11580.1. We reject Sandoval's argument because he ignores the rationale of the cases and the language of the statute.

The cases demonstrate permission is implied where the circumstances permit a finding the third party's use was or should have been within the contemplation of the owner. (See *Peterson* v. *Grieger, Inc.*, *supra*, 57 Cal.2d at pp. 52-53; *Souza* v. *Corti*, *supra*, 22 Cal.2d at pp. 460-461; *Financial Indem. Co.* v. *Hertz Corp.*, *supra*, 226 Cal.App.2d at p. 699.) While repeatedly recognizing the need to provide a source of compensation for the innocent victims of automobile accidents, the cases have never suggested that need should be fulfilled by finding coverage without regard to the conduct and expectations of the owner. The statute underscores the importance of the owner's expectations by limiting coverage to cases where use is "within the scope of [the owner's] permission."

Were we to ignore the contemplation of the owner—either actual or constructive—insurance coverage would rest not on an owner's consent but on ownership alone. Given the pertinent case law and the language of the

statute, we are not in a position to take that step. Finding coverage even where an insured had no reason to contemplate a third party's use would increase the risks currently covered by automobile insurance and presumably diminish its availability.[4] Thus the critical issue here is not whether Vince had permission to use the truck—there is no dispute he did. Rather we must determine whether Sandoval either contemplated or should have contemplated Del's use of the truck.

The answer to both questions may be found in Sandoval's deposition testimony. ■ With respect to the weight we must accord Sandoval's testimony, we are governed by the following: "As the law recognizes in other contexts (see Evid. Code, §§ 1220-1230) admissions against interest have a very high credibility value. This is especially true when, as in this case, the admission is obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts. Accordingly, when such an admission becomes relevant to the determination, on motion for summary judgment, of whether or not there exist triable issues of *fact* (as opposed to legal issues) between the parties, it is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits. [Citation.]" (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 22 [112 Cal.Rptr. 786, 520 P.2d 10].)

■ In his deposition Sandoval gave the following testimony: "Q: During this period which I am referring to, September and October of 1984, did you ever see Del Camp drive any vehicle?

"A. No. He wasn't allowed to drive anything.

"Q. I'm referrring to any vehicle of his own even.

"A. Not that I can remember because he had no driver's license and it was just 'No.' He wasn't allowed to drive vehicles.

". . . . . . . . . . . . . . . . . .

"Q. Did you ever tell [Del] that he couldn't drive any of the vehicles?

"A. I always told them he couldn't drive it unless he got a driver's license.

---

[4] In this case, of course, the policy of compensating tort victims is not directly implicated because Rodriguez's claim has in fact been resolved. Rather we are concerned with the related problem of who must bear the cost of the compensation, Sandoval or his insurer.

"Q. Do you remember sometime specifically when you told him he couldn't drive the vehicle?

"A. It was just, 'No, you can't drive until you get a driver's license.' You know. 'You just can't drive trucks.' That's why we had such a problem. Like Tim would have to help me and Craig would have to help me. We'd deliver the trucks and I would have to take them back, leave the guys there, and I'd have to go back again. The job was always harder than it should have been.

"Q. Had Del asked you to use the trucks before?

"A. Yes. He'd ask and I would say, 'No.' I'd always say, 'You can't drive the trucks.'

"Q. Do you remember any of the occasions and when they occurred when he would ask?

"A. He'd ask a lot of times if he could use the truck for over the weekend on a side job that he might have found, and I'd say, 'Well, I'll drive the truck over there and I'll leave it there and you can fill it up. You just fill it up. When it's done, you just call and I'll come and get the truck and take it to a dump.' If I let the truck be used at all to anybody, that's the only way it would be done."

Sandoval further testified that after the accident he confronted Del. "Q. Going back to the day of the accident, you said you spoke with Del . . . at the jail; is that correct?

"A. I think it was more like yelling at him.

"Q. Okay. And then did you talk with him again about the accident at any time?

"A. I asked, 'What are you doing there? What were you driving my truck for without no permission? You are not supposed to be driving anything period of mine.' All I remember is me saying, 'You owe me money for bailing you out and you better pay me.' I remember just being irate."

In light of the instructions Sandoval gave Del, Sandoval cannot now assert that he in fact contemplated Del would ever drive the truck. His testimony shows that he did not. Moreover, having repeated the instructions to Del over a period of time, having testified that he would make special arrangements when Del needed some of Sandoval's equipment, and

most importantly having testified that he had not seen Del driving any vehicles at or near the time of the accident, Sandoval cannot claim that he nonetheless should have expected that Del would disobey his explicit instructions. Sandoval's testimony eliminates any facts which would have given him reason to believe Del was driving his trucks.[5]

In sum then, because Mercury presented unrebutted evidence Sandoval had no reason to contemplate Del would drive his truck, Sandoval cannot establish Del was driving with any implied permission. Thus we must affirm the judgment.

Judgment affirmed.

Todd, Acting P. J., and Nares, J., concurred.

---

[5] We note that as against Rodriguez, Sandoval's statements were self-serving and hence were not entitled to the weight required by *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1.